## HINES, Director General of Railroads, v. JASKO.

(Circuit Court of Appeals, Third Circuit. June 23, 1920.)

No. 2530.

1. **Trial** ⟾251(8)—**Question submitted must be within issues.**
  Where the negligence declared on is not established by the proofs, it is error to submit the case to the jury on any other issue.

2. **Master and servant** ⟾137(5)—**Railroad not under duty to safeguard yard employés passing between standing cars.**
  That, in placing cars not then in use on standing tracks in a freight yard, spaces were sometimes accidentally left between them, *held* not to impose on the railroad company the duty of safeguarding employés, who voluntarily and without necessity used such openings as passageways.

In Error to the District Court of the United States for the District of New Jersey; Charles F. Lynch, Judge.

Action by Palina Jasko, administratrix of the estate of Joseph Jasko, deceased, against Walker D. Hines, Director General of Railroads. Judgment for plaintiff, and defendant brings error. Reversed.

Frederic B. Scott, of New York City, for plaintiff in error.

Frank M. Hardenbrook and Charles M. Egan, both of Jersey City, N. J., for defendant in error.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case Palina Jasko, administratrix of Joseph Jasko, brought suit and recovered a verdict against the Director General, operating the Delaware, Lackawanna & Western Railroad. The cause of action was alleged negligence in operating said railroad, which caused the death of Joseph Jasko, an employé. On entry of judgment on such verdict, the defendant sued out this writ of error.

The facts in the case were that decedent was employed as a car inspector in the Hoboken freight classification yards of said railroad. He was familiar with such work and its dangers, having been engaged in it for some years. On the evening of his death, he in company with Schwartz, a fellow workman, was inspecting and repairing a freight car laden with interstate freight, which stood on freight track 24. In making such repairs he had occasion to use a wrench and bolt, which were in a toolhouse which stood on the farther side of track 26, and about a car length to the eastward. To get these articles, Jasko left his companion, Schwartz, standing by the car on track 24, crossed over track 25, which was empty, and passed over track 26, through an opening about a yard wide between two cars standing on said track

26. This was the last seen of him alive. He evidently walked eastward along the side of track 26, got the wrench and bolt from the toolhouse, and was returning the same way across the opening between the two cars on track 26. Just then Schwartz, his companion, heard the noise of the two cars coming together and coupling, and a cry from Jasko. Crossing over, Schwartz found Jasko, with his lantern, the wrench, and the bolt, on the ground, with injuries which resulted in his death.

The alleged negligence of the defendant, as stated in the eighth paragraph of the amended complaint, was:

"That at said time and place the said railroad company, by its agents, servants, and employés, and without regard for the safety of plaintiff's intestate, negligently caused certain other cars, without any engine attached thereto, to be shunted or kicked against the standing cars between which plaintiff's intestate was compelled to pass as aforesaid, and to violently collide with and strike the same, and without any bell, whistle, or signal of any kind being given to plaintiff's intestate of the movement of said cars, and at which time the plaintiff's intestate was in the act of passing between the said cars as aforesaid."

The further cause in the second amendment, or clause 8½, to wit:

"That at said time and place the defendant omitted its aforesaid duties, in that it neglected its custom and duty to have a man ride on the foremost end of the car so shunted or kicked as aforesaid, to control it with hand brakes, and prevent it from striking with unusual and unnecessary force the car with which it came in contact."

[1] At the conclusion of the plaintiff's testimony, a motion for a nonsuit was made, the denial of which motion is now, inter alia, assigned for error. Referring, first, to the question as to what way or ways were open for Jasko to go from his car to the toolhouse, the facts are these:

Directly opposite where he and Schwartz were was the opening, about a yard wide, through which he passed and was killed. To the westward there was no opening in the cars on the track for ten car lengths. To the eastward of the opening, either two or three cars stood. Then came another opening of about a yard or a yard and a half, to the east of which stood a single car. Beyond that point the track was open. These openings between the cars were all accidental. On that point the proofs are by Schwartz:

"Q. And you told us just a minute ago some times the cars are all closed up and coupled together, and sometimes they are open? A. Yes. Q. And it all depends upon the train operations that are carried on in the yard on this and other tracks? A. Yes, sir. Q. And the openings are in one place to-day, in one part of the yard, and the next day they are in some other part of the yard? A. Yes, sir."

He further testified:

"Q. How long did you say you had been working in that yard? A. Over five years. Q. And do you know whether it was the custom in vogue in the yard to leave open spaces between lines of standing cars? A. He says there were pretty nearly always there were spaces between the cars; that track was used for cars they had no billings for, and they used to shift cars in there."

The place that Jasko crossed on track 26 was the shortest way to reach the toolhouse, but not the only way. In that regard Schwartz testified:

"Q. And was that the most direct way for him to reach this tool box from the point where he was, or was there a different way he could have gone? A. There was another way to go, but it would take a great deal longer."

He further said:

"Q. You testified yesterday, I believe, that in order to reach this tool box, or the way to reach this tool box, the most direct way, put the question, to reach this tool box, was to go through this opening between the cars, and if he hadn't used the opening he would have had to go a long ways around; ask him how far around Jasko would have had to have gone to reach this tool box, had he not used this opening between the cars? How far around he would have to go? A. Three car lengths he would have to walk. Q. And how would he have got across, if he had gone down three car lengths? A. He would have to cross track 26. Q. You say he would have had to go down three car lengths to have gone across to the tool box; ask him if that is right? A. Yes, sir."

From this it is clear that he could have crossed the track at the next opening, that is, eastward of the three cars, where he would also have had a narrow opening between those cars and the one beyond him, or, if he had passed around the last-named car, he would have had an entirely clear track. Such being the situation, and Jasko having evidently chosen to go through the opening directly opposite, and having been injured in doing so, do the proofs show the negligence alleged in the declaration, which, as we have seen, in substance was the shunting or kicking of the car west of the opening against the three cars east of it. Was the colliding car unattached to an engine, and did the road fail to have a man on it to control it with hand brakes and prevent it from striking with unusual or unnecessary force the car with which it came in contact?

A careful examination of the proofs satisfied us that they did not support the negligence charged. The only witness on that point was Schwartz, the companion of the decedent, who, as we have seen, stood at the car on track 24, which was about three car lengths directly north and opposite the crossing. The testimony of Schwartz is clear that the car, which was pushed in and caught Jasko, was not shunted or kicked in, but, on the contrary, was under control of an engine, and moved back in answer to the signal of the conductor, who was on the same side of the backing train of ten cars and within view of Schwartz. In that regard Schwartz's testimony is:

"Q. What caused those cars to come together over this open space, if he knows? A. The cars were pushed together and coupled. Q. What pushed them together, if you know? A. The engine, that was drilling these empty cars, was pushing them down the track. * * * Q. Did you see any one on the ground adjoining where these cars were that had bumped into the other cars? A. All I saw was the conductor giving the signal. Q. Where was this conductor, on the train or on the ground? A. He was on the ground. Q. And he signaled to what train and what engineer, if he knows; whom did he signal to? A. He was giving the signal to the engineer to push the cars down. Q. And as he gave this signal to the engineer, what did the engineer do, so far as he knows, or what movement did the cars make, if any? A. He pushed those cars. * * * Q. What caused these cars to come to-

gether over this open space, if he knows? A. The cars were pushed together and coupled. Q. What pushed them together, if you know? A. The engine, that was drilling these empty cars, was pushing them down the track."

As to the force with which they came together, Schwartz's testimony was:

"Q. At the time these cars were being pushed together by the engine, did you hear anything? A. I heard then the cars bumped together. * * * Q. Did you notice with what force, if any, the cars struck the standing car? A. They must have hit pretty hard, because you could hear a loud noise. Q. Well, what noise was it he heard? A. He heard a noise when the cars bumped together."

From this testimony it is clear, first, that the decedent could, if he had seen fit, have had a clear passage across track 26, a few car lengths to the eastward of where he crossed; second, that where he did cross was an optional and not a compulsory path in the performance of his work; third, that the colliding car was not kicked or shunted against the standing car at that opening; fourth, that the draft of cars was being backed under the control of an engine, under the signal of a conductor near the rear end of the train, and there is no proof that such backing was other than the usual in such operations. Such being the proofs in the cause, it is clear that the negligence with which the defendant was charged in the declaration, was not established by the proofs.

The negligence declared on not having been established by the proofs, it was, under the authorities (Excelsior v. Sweet, 59 N. J. Law, 441), error to submit the case to the jury on any other issue. But, in view of the fact that the case was by the charge submitted on an issue not pleaded, we will, for present purposes, assume that such issue was declared on, and inquire whether the proofs were such as showed negligence on the part of the defendant.

[2] This additional charge of negligence, as stated in the charge, is:

"That very often openings between cars were permitted to exist there in that yard, throughout the yard, and that it was a custom of yard employés to pass through these in and about their work; that that had been for years."

But one witness, Schwartz, testified in that regard, and his proof was that—

"There were pretty nearly always spaces between the cars. * * * It is just as it happened; sometimes the cars will couple up; other times they will shove them in there, and they will stay that way separated. * * * Whenever there are openings between cars, the employés, even from the docks, pass through between those cars."

His further testimony was:

"Q. And you told us, just a minute ago, sometimes the cars are all closed up and coupled together, and sometimes they are open? A. Yes. Q. And it all depends upon train operations that are going on in the yard, on this and other tracks? A. Yes, sir. Q. And the openings are in one place to-day, in one part of the yard, and the next day they are in some other part of the yard? A. Yes, sir."

In our judgment, this testimony did not show that uniformity, certainty, or continuity which establish a custom. Manifestly, the open-

ings between the cars were not designed, and such as happened were unintentional, accidental, and were not left in order to furnish a passageway for any one. When it is considered that such openings are a necessary incident to the operation of such a yard, it cannot be said that their existence implies an invitation to use them as a passageway, and that the railroad has, by reason of such accidental spaces, undertaken to safeguard an employé who voluntarily and without necessity chooses to use them. And, apart from this, no one has suggested how, in any practical way, the complicated work of a shifting yard could be workably carried on and trains made up, if the duty was placed on the railroad of placing trainmen in all positions where yard employés, approaching from either side, such numerous accidental openings, could be warned and stopped. Yet this is the warning duty the trial judge erroneously, as we think, placed on the railroad in his charge, when he said:

"If that custom existed as alleged, it was the duty of this defendant company to give reasonable warning or notice of some reasonable kind to employés passing or about to pass, through these openings between these cars, in going to and about their work, of the movement or contemplated movement of the cars near these openings or gaps, in other words, movements of the cars toward closing the opening between them."

The judgment below must therefore, in any aspect of the case, be reversed, and the cause remanded to the court below for further proceedings.